**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CENTRAL TRANSPORTATION SERVICES, INC., | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION** ) |
| v. | ) No. 13-1295 ) |
| BENNY COLE; LORI COLE; AND BRADY TRUCKING, INC., | ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the court on:

>   Plaintiff's Motion for Preliminary Injunction[1] and Memorandum in Support (Docs. 6,7);
>
>   Responses of defendants Brady Trucking, Inc. (Doc. 28) and Benny and Lori Cole (Doc. 29); and
>
>   Plaintiff's Reply (Docs. 33, 34).

The court held evidentiary hearings on the motion on September 30, 2013, and October 21, 2013.

Plaintiff Central Transportation Services, Inc. ("CTS") claims Benny and Lori Cole breached a contractual "non-compete" covenant by leaving CTS' employment and taking jobs with Brady Trucking, Inc., one of CTS' competitors. The verified complaint includes a breach of contract claim against the Coles and claims against all three

---

[1] The motion, which was filed in the Eighteenth Judicial District Court of Kansas prior to removal of the action to this court, was styled a motion for "temporary injunction," which is the Kansas equivalent of a preliminary injunction under Fed. R. Civ. P. 65(a). K.S.A. § 60-905.

defendants for violation of the Kansas Trade Secrets Act[2] and tortious interference with business relationships. CTS seeks a preliminary injunction against all three defendants to prohibit them from breaching the non-compete covenant, from interfering with or soliciting CTS' customers or employees, from misappropriating trade secrets or other confidential information, and from using any previously-disclosed trade secrets to compete unfairly against CTS. Defendants oppose the motion. Brady Trucking has also filed a motion to dismiss for lack of personal jurisdiction, which will be the subject of a separate order.

**I. Facts**

Benny and Lori Cole, a married couple from Bloomington, Illinois, owned and operated a dry-bulk motor freight business known as Benny Cole Trucking, Inc. The business operated out of a terminal in Bloomington leased by the Coles. It employed 10 or 11 drivers and had title to about 10 tractors and 13 trailers, although the company's assets were heavily financed and subject to security interests. By 2011 the company was "under water" and the Coles were unable to obtain additional financing, meaning the business and the Coles were on a path toward bankruptcy.

CTS is a Kansas corporation that provides trucking services throughout the United States. It has about 65 trucks that haul dry bulk products (such as cement, ash, salt, and lime) in pneumatic trailers. During a routine business call with a representative of CTS,

---

[2] CTS has indicated it is not relying on the trade secret claim to support its request for a preliminary injunction. (Docs. 33 at 1, 34 at 1.)

-2-

Benny Cole expressed some interest in selling his business and going to work for someone else. Benny also had discussions during this period with Brady Trucking, one of CTS' competitors, about going to work for them. Steve Cullins, the owner of CTS, and Kurt Warren, CTS' chief financial officer, subsequently talked to Benny about hiring the Coles and buying out the assets of Benny Cole Trucking.

The Coles and CTS reached an agreement in principle. At the request of CTS' owner, the Coles traveled to Kansas in September 2011 to close the deal. The Coles had to obtain an advance from CTS to afford the cost of the drive from Bloomington. They did not have a lawyer. At the closing, CTS representatives presented the Coles with written agreements drafted by its lawyers.

One of the documents was an "Asset Purchase Agreement" (APA). The Coles and CTS executed the document at the meeting on September 30, 2011. It provided that Benny Cole Trucking would transfer its assets including inventory, trucks and trailers, and various materials including customer lists to CTS. In return, CTS would pay the sum of $1,046,159. Virtually all of this money went to creditors to satisfy Benny Cole Trucking's outstanding liabilities.[3] Because the Coles had co-signed or guaranteed the company's debts, however, they received the benefit of the payment even though none of it went to them.

Section 4 of the APA, entitled "Covenant-Not-to-Compete and

---

[3] CTS claims the purchase price exceeded the fair market value of Benny Cole Trucking's tangible assets and that a significant portion it was made to acquire the company's goodwill. But CTS failed to show the fair market value of the tangible assets at the hearing. The fact that virtually all of the purchase price went to creditors could indicate that the assets were purchased for something approaching fair market value.

-3-

Employment Agreements," provided:

> For a period of three (3) years from the Closing Date, Benny and Lori Cole agree that they will not engage (as an individual or as a stockholder, trustee, partner, financier, agent, employee or representative of any person, firm, corporation or association), or have an interest direct or indirect, in any business in competition with the business of the Buyer which is located within the continental United States; provided that this covenant not to compete will not prevent Benny and Lori Cole from acquiring and holding not to exceed two percent (2%) of the outstanding shares of any corporation engaged in such a competitive business if such shares are available to the general public on a national securities exchange. In the event of a breach of any covenant contained in this covenant not to compete, the Buyer will be entitled to an injunction restraining such breach in addition to any other remedies provided by law or equity. As further consideration of such covenant, Buyer agrees to enter into an at-will employment agreement with Benny Cole and Lori Cole. The employment agreement with Benny Cole shall have the following terms: (1) an annual salary of $60,000; and (2) a commission on all sales generated by Benny Cole on any new accounts in an amount to be agreed by the parties. The employment agreement with Lori Cole shall be at the rate of Fourteen Dollars ($14.00) per hour.

(Pl. Exh. 1). Additional terms in the APA provided that the agreement was to be governed by Kansas law and that any action arising out of it could only be commenced in the District Court of Sedgwick County, Kansas, or the United States District Court for the District of Kansas.

At the closing CTS also presented employment agreements to the Coles that included the following terms. The Coles were to be employed on an at-will basis with the above-stated compensation. Benny would also receive a commission on sales generated by him. The employment agreement could be terminated by either party upon written

-4-

notice, but Sections 4 and 5 were said to survive termination. In Section 4 the employee agreed that during the term of his employment and after termination he would not use or divulge any confidential information obtained as a result of employment and, in the event of a breach, that CTS would be entitled to a permanent injunction to prevent or restrain the breach. In Section 5 the employee agreed that CTS would be entitled to an accounting and repayment of any profits obtained as a result of a breach of Section 4. The Coles and CTS executed these agreements as well.

Benny asked CTS to assume the lease on the Bloomington terminal but it did not do so. Instead, CTS began effectively subleasing the terminal from the Coles by directly making the $3,000 monthly lease payments to the landlord. Benny also asked at the closing and at least once thereafter for copies of the APA and employment agreements, but no copies were given to him.

CTS viewed this buyout as an opportunity to expand its business into a geographical area where it had not done much business. Benny Cole had established relationships with drivers and various lines of business in and around the Illinois area. CTS hired most if not all of the drivers who had previously worked for Benny Cole Trucking. It was anticipated that the buyout and the hiring of Benny Cole would bring the same book of business to CTS, and in fact it did so. Benny had established relationships with freight brokers and customers who used dry bulk hauling services. His day-to-day duties at the terminal before the buyout included submitting price bids, negotiating and closing deals for trucking services, and dispatching drivers to haul loads. He was expected to and did continue these duties after becoming

-5-

a CTS employee. He was given minimal materials and supervision from CTS after the buyout. Essentially he was expected to continue operating as he had before and to try to expand the business. Lori Cole, both before and after the buyout, performed secretarial or administrative duties at the terminal, including answering phones, entering orders, taking care of driver log books, and similar tasks. She did not prepare price quotes or solicit business.

After working for CTS for about a year, Benny was informed by Cullins (CTS' owner) that he intended to move the dispatch function from the Bloomington terminal to Wichita. This indicated to Benny that CTS was going to close the Bloomington terminal. Cullins had Benny come to Kansas City with his customer list. At this meeting Cullins told Benny he wanted to focus more on brokerage and less on hauling loads for others. Brokerage involved contacting trucking companies, taking their bids and arranging for them to haul loads for customers, and getting a percentage of each completed transaction. Benny, who had not worked as a broker, was concerned he could be out of a job and also "on the hook" for the remainder of the Bloomington terminal lease.

Benny testified he believed his non-compete restriction with CTS was for a period of one year after closing. There is no evidence directly contradicting this asserted belief, although the APA clearly provided for a term of three years.

On March 21, 2013, Benny emailed Charles Johnson of Brady Trucking to inquire about a possible job. Benny's message said "[m]y contract is up with CTS" and he wanted to know if Brady Trucking "had any thoughts on branching out anymore...." Benny met with Johnson on

April 17, 2013 in Bloomington. The evidence indicates that Benny told Johnson he had been subject to a one-year non-compete restriction under the APA but the one-year period had expired. Benny subsequently provided Johnson with information on the business being done out of the Bloomington terminal and the two negotiated an agreement on compensation. Johnson offered Benny a salary of $80,000 per year plus an available bonus to be based on the amount of revenue generated through the Bloomington terminal. Both sides anticipated that Brady Trucking would obtain most of CTS' drivers and business then operating out of the terminal. It was also understood that Brady Trucking would hire Lori Cole in a job similar to the one she was then performing.

Benny and Johnson exchanged emails in April 2013 in anticipation of Benny coming to work for Brady Trucking. Benny told CTS' drivers at the terminal that he was planning to work for Brady and told them they could apply for a job there. He sent Johnson contact information for the drivers and information about their likely pay demands, including what Benny Cole Trucking paid them in the past and how much CTS was currently paying them. Chuck Johnson emailed Benny Cole that he could offer the drivers compensation of 23% (of revenue), which would put them above the 40 cents-per-mile rate they were being paid by plaintiff. Benny responded that he thought that "would be great."

Johnson sent Benny an employment contract on Monday, April 29, 2013. Benny gave notice to CTS that same day that he would be terminating his employment, offering to work through Friday. He signed the employment agreement with Brady Trucking on April 29. The agreement provided for at-will employment at the agreed-upon salary. It included a "Non-Competition and Non-Solicitation" clause that

-7-

prohibited Benny from working for any competitor of Brady Trucking or soliciting any employees or customers of the company for two years after leaving the company. A provision defining the "restricted area" was somewhat incomplete but it suggested the restriction would apply throughout the United States.

On May 2, 2013, CTS' lawyers sent a letter notifying Brady Trucking of the three-year non-compete clause in the APA. The letter asserted that CTS had notified the Coles of these obligations and of plaintiff's intent to enforce them, and it stated that CTS suffered and will suffer damages as a result of the Cole's actions including "the diverting of CTS' customers to Brady Trucking, Inc."

The Coles thereafter worked for Brady Trucking out of the Bloomington terminal. Benny was employed as the terminal manager. His duties included dispatching trucks, giving drivers their daily assignments, and making sure customers' expectations were met.

Of the 11 or so drivers who had worked for CTS out of the Bloomington terminal(most of whom had previously worked for Benny Cole Trucking), CTS was able to retain one or two of them after Benny left. Most of the other drivers were hired by Brady Trucking. Most of the customers who had used or engaged CTS' services out of the terminal now used Brady Trucking. CTS' representatives called these customers in an attempt to retain their business but "didn't meet with great results," according to CTS. Brady Trucking had prior relationships with a number of these entities, many of whom were freight brokers. Benny provided information to Brady about the rates that CTS charged on various accounts, which assisted Brady in bidding on the available jobs. In the latter half of 2013, Brady was generating about $165,000

per month in (gross) revenue out of the Bloomington terminal from former CTS customers. Since Benny left CTS' employment, CTS has made no effort to lease another terminal in or around the Bloomington area.

Brady Trucking referred the matter of the Coles' non-compete agreement to its lawyers. Upon their advice, Brady Trucking terminated Benny's job duties as manager and assigned him a position as a truck driver at a salary of $85,000. No evidence was presented at the preliminary injunction hearing that Benny is currently doing anything at Brady other than driving a truck (and perhaps performing certain safety-related tasks) or that he is engaging in any of his former responsibilities as terminal manager, such as submitting bids or soliciting potential customers. Lori Cole continues to work at Brady Trucking in a secretarial capacity.

## II. Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy. <u>Schrier v. University Of Colorado</u>, 427 F.3d 1253, 1258 (10th Cir. 2005). For the court to grant a preliminary injunction, the plaintiff must clearly and unequivocally show that: (1) there is a substantial likelihood of success on the merits; (2) plaintiff will suffer irreparable injury unless the injunction is issued; (3) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not be adverse to the public interest. <u>See</u> <u>Winter v. Nat. Res. Defense Council, Inc.</u>, 555 U.S. 7, 20 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 398

(1981).[4]

**III. Discussion**

<u>Irreparable harm</u>. A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. <u>Port City Properties v. Union Pac. R. Co.</u>, 518 F.3d 1186, 1190 (10th Cir. 2008) (<u>citing</u> <u>Dominion Video Satellite, Inc. v. Echostar Satellite Corp.</u>, 356 F.3d 1256, 1260 (10th Cir. 2004)). Because of this, courts may require a showing that irreparable injury is likely before the other requirements for an injunction will be considered.

CTS first argues it does not have to show irreparable harm because the Coles agreed in the APA that plaintiff was entitled to an injunction to prevent any breach of the non-compete restrictions. (Doc. 7 at 11). The court rejects this contention. "While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief." <u>Dominion Video Satellite</u>, 356 F.3d at 1266. CTS must still make a showing of irreparable harm, supported by evidence, to warrant exercise of the court's equitable

---

[4] Certain types of preliminary injunctions are particularly disfavored and require special scrutiny: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. <u>Schrier</u>, 427 F.3d at 1259 (<u>citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)). None of the parties contend that CTS' motion requests one of these disfavored injunctions.

-10-

jurisdiction and the issuance of an injunction. Such a showing is all the more necessary when the extraordinary remedy of a preliminary injunction is sought.

CTS has identified the following as irreparable harm resulting from defendants' actions: the loss of business, loss of reputation among competitors, customers and suppliers, and loss of customers, employees and goodwill. (Doc. 7 at 12). Although in some circumstances the loss of such items can amount to irreparable harm, the court concludes for the reasons below that CTS has failed to make a sufficient showing of irreparable harm in this instance to justify the requested preliminary injunction.

First and foremost, the evidence suggests that CTS' losses from defendants' allegedly wrongful conduct can be readily quantified and compensated by money damages. Indeed, CTS' lawyers stated in their May 2, 2013 letter that CTS has suffered and will suffer damages. Although no dollar amount is mentioned, it is reasonable to assume the lawyers meant money damages.

CTS has identified particular customers and a "book of business" it claims to have lost from defendants' actions. CTS' own records show the amount of money generated from this portion of its business since the APA was executed – a track record covering more than a year – and no reason is given why this documented performance could not be used to reasonably project what CTS' likely earnings would have been for the remaining period of the Coles' non-compete restrictions.[5] Such an estimate could be further substantiated by the actual performance of

---

[5] The APA was signed September 30, 2011, meaning the three-year period will expire in about 11 months.

-11-

Brady Trucking since obtaining that book of business. In <u>Wichita Wire, Inc. v. Lenox</u>, 11 Kan.App.2d 459, 726 P.2d 287(1986), where the purchaser of a business claimed that unfair competition by a former owner caused the purchaser to lose customers, the court concluded that "the damage caused by loss of established business customers is insufficient to establish irreparable injury because it is easily calculated by determining the amount of business [defendant] conducted with former ... customers [of the purchased business]." Like the <u>Wichita Wire</u> case, plaintiff's claimed injuries can be readily quantified. The "loss of identifiable customers, who had generated a known dollar amount of business, is a calculable injury which is insufficient to establish irreparable harm justifying the entry of a temporary injunction." <u>Wichita Wire</u>, 726 P.2d at 292.[6]

The court notes also the lack of evidence that CTS' business will suffer any significant injury beyond the economic loss identified above. CTS claims injury to its reputation and goodwill, but no evidence substantiating the likelihood of such injuries was presented. Nor was evidence presented that the loss of business and customers from the Bloomington terminal is likely to have a "carry over" effect on the remainder of CTS' business or on the viability of CTS as a whole. In so finding, the court in no way diminishes CTS' claim that it suffered harm from the asserted breach of the non-compete

---

[6] Kansas cases have since clarified that language in <u>Wichita Wire</u> saying a movant must show it "will suffer" irreparable injury suggested too high a burden, pointing out that it is sufficient if the movant shows a "reasonable probability" of such harm. See <u>Bd. of County Com'rs of Leavenworth Co. v. Whitson</u>, 281 Kan. 678, 684, 132 P.2d 920 (2006). But this clarification does not call into question <u>Wichita Wire's</u> observation that a discrete and calculable economic injury does not amount to irreparable harm.

-12-

restriction. The point is that CTS' evidence of harm is essentially – if not entirely – a quantifiable economic loss. And "[e]conomic loss 'usually does not, in and of itself, constitute irreparable harm....'" Port City Properties v. Union Pacific R. Co., 518 F.3d 1186, 1190 (10th Cir. 2008).

Another factor undermining CTS' claim of irreparable harm without a preliminary injunction is that Brady Trucking has now limited Benny Cole's duties to truck driving and safety-related tasks. To the extent his employment is so limited and does not involve solicitation of customers, bidding on jobs, or otherwise using the special business expertise or relationships that led CTS to buy out his business in the first place, it would be a significant stretch to say that his continued employment as a truck driver for the next 11 months is likely to cause irreparable harm to CTS. Cf. Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc., 86 F.Supp.2d 1102, 1107 (D. Kan. 2000) (plaintiff showed threat of irreparable harm because "[d]efendants are engaging in behavior that is likely to result in plaintiffs' further loss of customers as well as customer goodwill."). This is doubly true with respect to Lori Cole, who as far as the evidence shows is performing secretarial work for Brady Trucking that in no way poses a competitive threat to CTS' business. So long as the Coles' job responsibilities are in fact limited in this fashion, the court sees no threat of irreparable harm to CTS that would warrant preliminary injunctive relief.

Plaintiff argues that Volume Shoe Corp. v. Jolosky, 1989 Kan.App. LEXIS 247, 772 P.2d 287 (Table) supports a finding of irreparable harm because of the "unfair head start" that Brady Trucking gained by

obtaining the Coles' employment. But as Volume Shoe noted (citing Wichita Wire), "[i]f the injury due to logs of business can be redressed adequately with monetary damages for breach of contract, the injury is not irreparable and injunctive relief is inappropriate." The injury due to plaintiff's loss of the Bloomington business can be quantified and redressed with monetary damages.

Volume Shoe also involved the director of a nationwide chain of stores who had been "intimately involved" in the plaintiff's short and long-range strategic planning. His detailed knowledge of the plans was found to be a competitive threat in the hands of a competitor. By contrast, CTS claims Benny Cole had (and disclosed) knowledge of CTS' customer list and its pricing structure for business generated out of the Bloomington terminal. It contends the loss or unauthorized use of these asserted trade secrets constitutes irreparable harm. (Doc. 33 at 3-4). (The court notes that this argument seems at odds with CTS' concession elsewhere that it is not relying on its trade secret claim to support an injunction.) At any rate, the identities of CTS' customers can hardly be regarded as any great secret, particularly when a substantial portion of them are actually brokers who solicit bids and deal with any number of trucking companies. As for the disclosure of CTS' rates and other pricing information – aside from the futility of attempting to close the barn door after the horse has already left – the evidence fails to show any substantial, ongoing competitive disadvantage from disclosure of such information. It is not clear to the court that this pricing information was truly confidential to begin with. And given the likelihood that costs and margins fluctuate over time with changing market conditions, no

-14-

presumption is warranted that access to a competitor's historical pricing structure provides any sort of lasting competitive advantage in the dry bulk hauling business. In sum, the evidence fails to show a threat of irreparable harm sufficient to warrant the requested preliminary injunction.[7]

**IV. Conclusion**

Plaintiff's Motion for Hearing (Doc. 8) has been GRANTED. Plaintiff's Motion for Preliminary Injunction (Doc. 6) is DENIED.

IT IS SO ORDERED.

Dated this 6th day of November 2013, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE

---

[7] The court has considered the other preliminary injunction factors as well, but in view of the lack of irreparable harm they do not warrant issuance of the requested preliminary injunction.