**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CENTRAL TRANSPORTATION SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | **CIVIL ACTION** |
| v. | ) ) | No. 13-1295 |
| BENNY COLE, LORI COLE, and BRADY TRUCKING, INC., | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER**

Before the court are the following:

 Brady Trucking, Inc.'s Motion to Dismiss or Transfer (Docs. 13, 14); and

 Central Transportation Services, Inc.'s Response (Doc. 30).

[No Reply was filed.]

**I. Facts**

The following facts, which are accepted as true for purposes of the motion to dismiss, are taken from CTS' verified complaint and from CTS' response to the motion to dismiss.

Central Transportation Services, Inc. ("CTS") is a Kansas corporation that provides trucking services. It primarily hauls dry bulk products. It operates throughout the United States.

Benny and Lori Cole, residents of Illinois, operated a trucking business known as Benny Cole Trucking, Inc., out of a terminal in Bloomington, Illinois. Benny managed the business and his wife Lori worked as a secretary.

Brady Trucking, Inc., is a Utah corporation that provides dry bulk trucking services. It is a competitor of CTS' that operates throughout the United States.

On September 30, 2011, CTS and the Coles entered an "Asset Purchase Agreement" (APA) pursuant to which CTS bought out substantially all of Benny Cole Trucking's assets in exchange for a payment of $1,046,159.00. As part of the agreement the Coles were employed by CTS at an agreed-upon rate of compensation. The APA included a "Covenant-Not-to-Compete" which said that for three years from the date of closing, the Coles will not engage (including as an employee) in any business in competition with CTS within the continental United States. The APA included a "forum selection clause" stating that any action to enforce the APA must be commenced in the District Court of Sedgwick County Kansas or in U.S. District Court for the District of Kansas. In addition to the APA, the Coles entered employment agreements under which they promised not to use or disclose confidential information obtained as a result of their employment with CTS.

Benny and Lori Cole continued to operate the Bloomington terminal as employees of CTS. They largely continued with the same customer base and drivers as Benny Cole Trucking.

About 18 months later, in March of 2013, Benny Cole contacted Brady Trucking to solicit employment.[1] He represented to Brady that "his contract was up" with CTS. Doc. 30, Exh. A. He provided Brady

---

[1] In a separate hearing in this matter, Benny Cole testified that certain changes being implemented by CTS made him concerned that he was going to lose his job and be responsible for the Bloomington terminal lease.

with confidential information including the amount of business CTS was doing with customers from the Bloomington terminal. Benny also represented that if he came to work for Brady he could bring his current customers with him and the CTS truck drivers who were working out of the Bloomington terminal.

Brady Trucking offered to employ Benny and Lori Cole, along with the CTS drivers at the Bloomington terminal. Benny and Lori Cole began working for Brady on May 1, 2013. Benny was initially employed as the Terminal Manager of the Bloomington terminal. CTS had been subleasing the Bloomington terminal from Benny Cole. After Benny and Lori Cole terminated their employment with CTS, Brady took over the sublease of the terminal.

Upon discovering these facts, CTS wrote letters to the Coles and to Brady on May 2, 2013. CTS' letter notified Brady of the APA and its three-year non-compete covenant. Doc. 30, Exh. G. Brady requested a copy of the APA, which was provided on May 13, 2013. Shortly thereafter Brady changed Benny's title to "Driver/Safety" and changed his compensation to a straight salary of $85,000 per year.

CTS allegedly lost customers and revenue of about $2 million annually to Brady from the loss of business out of the Bloomington terminal. CTS contends it had to close its Bloomington terminal business due to the loss of customers and drivers and the terminal itself.

CTS alleges that the Coles and Brady have contacted current CTS customers for the purpose of interfering with CTS's relationship with those customers and to induce them to conduct their business with Brady.

Count 1 alleges that the Coles have breached the APA and their employment agreements. Count 2 alleges that the Coles and Brady have violated the Kansas Uniform Trade Secrets Act by misappropriating CTS's trade secrets. Count 3 alleges the Coles and Brady have "intentionally and flagrantly sought to induce many, if not all, of CTS's customers to become customers of Brady Trucking"; that the conduct was "malicious, intentional and knowingly in violation of post-employment restrictions the Coles had with CTS"; and that this was "accomplished ... through the misappropriation of CTS's confidential and proprietary information and trade secrets." CTS claims it has or will suffer loss of goodwill, customer relationships, and money damages as a result.

**II. Motion to Dismiss**

Brady Trucking moves to dismiss the complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Alternatively, Brady argues the action should be dismissed for improper venue under 28 U.S.C. § 1391 or should be transferred to Utah or Illinois for convenience of the parties and witnesses under 28 U.S.C. § 1404(a).

On a Rule 12(b)(2) motion to dismiss, the plaintiff must make a prima facie showing that the court has personal jurisdiction over the defendant. See Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000). The court must accept the plaintiff's allegations as true and resolve all factual disputes in its favor notwithstanding contrary positions by the defendants. Heating and Cooling Master Marketers Network, Inc. v. Contractor Success Group, Inc., 935 F.Supp. 1167, 1169 (D. Kan. 1996).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." TH Agriculture & Nutrition, LLC v. Ace European Group, Ltd., 488 F.3d 1282, 1286-87 (10th Cir. 2007). Because the Kansas long-arm statute is construed liberally to allow jurisdiction to the full extent permitted by due process, the court ordinarily proceeds directly to the constitutional issue. TH Agriculture, 488 F.3d at 1287 (citing OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1087 (10th Cir. 1998)).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985). Therefore a "court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum state." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1979). The requisite minimum contacts may be established under one of two theories: "specific jurisdiction" or "general jurisdiction."

Specific jurisdiction, which applies when the suit arises out of or relates to defendant's contacts with the forum State, calls for a two-step inquiry. Monge v. RG Petro-Machinery (Grp.) Co. Ltd., 701 F.3d 598, 613 (10th Cir. 2012). First, has plaintiff shown that defendant has sufficient minimum contacts with the State?  Second, would personal jurisdiction over defendant offend "traditional notions

-5-

of fair play and substantial justice"? The requisite minimum contacts may be established if defendant has purposefully availed itself of the privilege of conducting activities within the forum State, or if it has purposefully directed its activities at the forum state.[2] The "purposeful availment" requirement precludes personal jurisdiction arising from random, fortuitous or attenuated contact. A defendant's conduct and connection with the forum must be such that "he should reasonably anticipate being haled into court there." Monge, 701 F.3d at 613 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). See also Fireman's Fund Ins. Co. v. Thyssen Min. Const. of Canada, Ltd., 703 F.3d 488 (10th Cir. 2012).

General jurisdiction, by contrast, arises when a defendant's continuous corporate operations within a State are so substantial and of such a nature as to justify suit against defendant on causes of action arising from dealings entirely distinct from those activities. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2854 (2011). General jurisdiction requires that defendant have contacts with the forum "so continuous and systematic as to render [it] essentially at home in the forum state." Fireman's Fund, 703 F.3d at 493 (quoting Goodyear Dunlop, 131 S.Ct. at 2851).

**III. Discussion**

CTS first argues the court may exercise general jurisdiction over Brady because "it conducts business in Kansas by making deliveries to Kansas." Doc. 30 at 5. CTS adds that Brady has

---

[2] The "purposefully availed" inquiry is typically employed in contract cases, while the "purposefully directed" inquiry is more often used in tort cases. Dudnikov v. Chalk & Vermillion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008).

conducted business with CTS in the past arising out of the Bloomington terminal.

The fact that Brady occasionally delivers to customers in Kansas is not sufficient, by itself, to show continuous and systematic contacts with the State that "render it essentially at home" here. No allegation is made with respect to the frequency or details of Brady's business activities in Kansas. Brady claims in an affidavit that it has no regular or systematic contacts with Kansas, that it has no property, employees or assets in here, that it does not advertise or solicit business here, and that it has had "only occasional sporadic loads delivered within Kansas" when a customer has so requested. As for its interactions with CTS, Brady alleges that on a few occasions it was contacted by CTS, acting as a broker, to deliver loads that mostly originated and ended outside of Kansas. Doc. 14-1. CTS cites nothing to contradict these allegations. Under the circumstances CTS has failed to make a prima facie showing of the systematic and continuous contacts that would make exercise of general jurisdiction over Brady appropriate. See Goodyear Dunlop Tires, 131 S.Ct. at 2856 (noting prior decision that "mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."); Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 329 (5th Cir. 1996) (trucking company's sporadic contacts with Texas insufficient to support general jurisdiction).

CTS next contends exercise of specific jurisdiction is appropriate because of Brady's "employment, and continued employment,

of the Coles with full knowledge of the APA and its forum selection clause." Doc. 30 at 6. It contends Brady's actions at a minimum show "a severe lack of diligence," because it was informed by Benny Cole that he had a non-compete agreement with CTS, and Brady subsequently "assumed the risk of litigation" by continuing to employ the Coles after it became aware of the specific terms of the APA. CTS contends Brady thereby made itself a "closely-related party" to the agreement, and that under the "closely-related party doctrine" it is bound by the APA forum selection clause even though it was not a signatory to the agreement. (Citing Mozingo v. Trend Pers. Servs., 2011 U.S. Dist. LEXIS 95522, *19-20, 2011 WL 3794263 (D. Kan., Aug. 25, 2011)).

If a forum selection provision has been obtained through a freely negotiated agreement and is not unreasonable and unjust, its enforcement does not offend due process. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, n.14 (1985). But this rule, which is based on principles of waiver and consent, was adopted for signatories who freely negotiate and adopt an agreement. A number of cases have extended the rule to bind persons or entities who did not agree to a forum selection clause but who are "closely related" to a signatory.[3] There seems to be little discussion, however, of the due process implications of exercising jurisdiction over such non-signatories.

---

[3] Numerous circuits have applied the doctrine in one form or another. See e.g., Xena Investments, Ltd. v. Magnum Fund Mgmt. Ltd., 726 F.3d 1278 (11th Cir. 2013); Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714 (2nd Cir. 2013); Adams v. Raintree Vacation Exchange, LLC, 702 F.3d 436 (7th Cir. 2012); Holland America Line Inc. v. Wartsila North America, Inc., 485 F.3d 450 (9th Cir. 2007).

The court finds no Tenth Circuit cases on point.[4] A review of other decisions shows that the closely related party doctrine has most often been applied to persons who are third-party beneficiaries of a contract, to corporate officers or corporate entities affiliated with a signatory, or to successors-in-interest of a signatory. See e.g. Hugel v. Corporation of Lloyd's, 999 F.2d 206 (7th Cir. 1993) (corporations wholly owned or controlled by signatory were bound by contract's forum selection clause); Mozingo v. Trend Personnel Svcs., 2011 WL 3794263 (D. Kan., Aug. 25, 2011) (third-party beneficiaries of life insurance agreement and president of corporation were bound by forum selection clause); Magi XXX, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714 (2nd Cir. 2014) (Vatican State, the grantor of a license, was closely related to its licensee and could enforce forum a selection clause in a lawsuit over a sublicense).

One recent case applying the doctrine summarized it as follows: "A non-party to a contract may be subject to its forum selection clause if the non-party is so 'closely related' to either the parties to the contract or the contract dispute itself that enforcement of the clause against the non-party is foreseeable." Recurrent Capital Bridge Fund I, LLC v. ISR Systems and Sensors Corp., 875 F.Supp.2d 297, 307 (S.D.N.Y. 2012). The same court noted the phrase "closely related" is "not particularly illuminating," but "[r]egardless of the specific application, the enforcement of the forum selection clause against the

---

[4] The Mozingo district court judgment cited by CTS was affirmed by the Tenth Circuit. Mozingo v. Trend Personnel Services, 504 Fed.Appx. 753, 2012 WL 6051529 (10th Cir. 2012). But the district court's finding that certain closely-related parties were bound by a forum selection clause was not raised as an issue on appeal and was not reviewed by the circuit.

non-party must have been foreseeable prior to suit, which implies that the non-signatory must have been otherwise involved in the transaction in some manner." See also Adams v. Raintree Vacation Exchange, LLC, 702 F.3d 436, 440 (7th Cir. 2012) (the doctrine applies where there is "affiliation," such as common ownership, or "mutuality," such as an agent of a hidden principal).

Assuming that a non-signatory can sometimes be bound by a forum selection clause that it did not agree to, the court nevertheless concludes it would violate due process to exercise personal jurisdiction over Brady in Kansas based solely upon the forum selection clause in the Coles' agreement with CTS. There was no relation or affiliation of any kind between the Coles and Brady when the Coles entered the APA. More than a year after that agreement was signed, Benny contacted Brady and solicited a job. He erroneously represented to Brady that his non-compete restriction with CTS had expired,[5] and he and Brady then entered into an employment agreement. These facts indicate – and CTS has not alleged otherwise – that Brady only become aware of the three-year employment restriction and the forum selection clause after it had entered an employment contract with the Coles. At the time it engaged the Coles, Brady thus had no contacts with Kansas and no reason to anticipate being sued in Kansas for pursuing business opportunities with the Coles in Illinois. From the perspective of Brady, it engaged an Illinois resident to operate a trucking business focused on Illinois and the surrounding area. Its actions were in no way directed at or focused toward Kansas. It did

---

[5] Doc. 30, Exh. A.

not seek to avail itself of a privilege of doing business in Kansas, and it was not foreseeable to Brady at that point that it could be sued in Kansas for hiring the Coles. Cf. Medtronic, Inc. v. Endologix, Inc., 530 F.Supp.2d 1054, 1057 (D. Minn. 2008) (third-party employer closely related because it solicited employees while being "fully aware of their [non-compete] agreements and, hence, the forum selection clauses.")

It is true that within a few days of hiring the Coles, Brady was informed by CTS of the three-year non-compete provision, and within a few weeks thereafter it was given a copy of the APA with the forum selection clause. Doc. 30 at 4. It chose at that point to retain the Coles as employees and to continue developing and operating the trucking business out of the Bloomington terminal. But this fact does not justify binding Brady to a forum selection clause agreed to by the Coles. Even if it was foreseeable to Brady at that point that it could be brought into litigation involving the non-compete provision, "'foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980). By adhering to its own contract with the Coles, Brady was not purposefully directing its activities at or toward the State of Kansas.

CTS says the closely related party doctrine has been applied in similar circumstances, citing two District of Minnesota cases involving employees subject to contractual restrictions on other employment: ELA Med., Inc. v. Arrythmia Mgmt. Assocs., 2007 U.S. Dist. LEXIS 102583 (D. Minn., Feb. 21, 2007) and St. Jude Med., S.C., Inc. v. Biosense Webster, Inc., 2012 U.S. Dist. LEXIS 62534 (D. Minn., May

-11-

4, 2012). In both of those cases the employee left its employer for a new employer, prompting litigation. Both decisions found the new employer was bound by a forum selection clause in its employee's agreement with the former employer. But these decisions are otherwise distinguishable from the instant case. In ELA Medical the new employer did "not expressly raise a personal jurisdiction objection based on its status as a non-signatory," so the court found it unnecessary to address that issue. It went on to conclude that the new employer was bound by the forum selection clause because it had actively sought the employee knowing that she was employed under the contract with the restrictive clauses. The court also cited the fact that the new employer joined with the employee as a plaintiff in a declaratory judgment action in another district where it sought a ruling as to all the parties' rights under the agreement.

Similarly in St. Jude Medical the new employer joined the employee in filing a declaratory judgment action, prompting the Minnesota court to find the new employer was "arguably acquiescing in the forum selection clauses within those [employment] agreements" and that "[a]s a voluntary plaintiff [the new employer] will not now be heard to object to jurisdiction limited to the venue[] to which [their] co-plaintiffs agreed." St. Jude Medical, 2012 U.S. Dist. LEXIS 62534 at 13 (citation omitted). By contrast, the facts before the court are that Brady was not aware of the restriction when it contracted with the Coles and did not voluntarily join with them in filing any action over the CTS employment agreement.

In Calder v. Jones, 465 U.S. 783 (1984), the Court found there was "purposeful direction" at the forum State based on three factors:

-12-

there was an intentional act by the defendant; it was expressly aimed at the forum State; and it was done with knowledge that the brunt of the injury would be felt in the forum State. See Dudnikov v. Chalk & Vermillion Fine Arts, Inc., 514 F.3d 1063, 1071-72 (10th Cir. 2008) (summarizing Calder). While it might be fair to say from CTS' allegations that Brady engaged in intentional acts which it knew would result in injury in Kansas (given that CTS is headquartered here), CTS has not cited a factual predicate for concluding that Brady's actions were "expressly aimed" at Kansas or a Kansas resident. Drayton Enterprises, L.L.C. v. Dunker, 142 F.Supp.2d 1177 (D.N.D. 2001) (fact that effects of defendant's alleged trade secret violation would be felt in forum state was not sufficient basis for personal jurisdiction). None of the allegedly tortious acts of Brady occurred in Kansas or were specifically directed at Kansas. The line of customers and business that Brady acquired from CTS by allegedly tortious means was overwhelmingly carried on completely outside the State of Kansas. The business was operated out of a terminal in Bloomington, Illinois, under the management of an Illinois resident. None of the former CTS employees acquired by Brady are alleged to be Kansas residents. All of the allegedly tortious acts occurred outside the State of Kansas.

The court concludes CTS has failed to make a prima facie showing that Brady had sufficient minimum contacts with Kansas to warrant specific jurisdiction. The nature, quality, and quantity of its contacts with the Kansas, and their relationship to the causes of action are not sufficient to create a reasonable expectation of being haled into court in Kansas. The court further concludes it would

-13-

offend traditional notions of fair play and substantial justice for this forum to exercise jurisdiction over Brady on the claims in the complaint. See Dudnikov, 514 F.3d at 1080 (listing relevant factors). The factors weighing against exercise of jurisdiction here include the burden on Brady of having to defend in a remote forum unrelated to the claims and the remote interest that Kansas has in resolving this dispute as compared to Illinois, where virtually all of the challenged actions occurred. These interests outweigh CTS' interest in a convenient forum to assert its claims.

**IV. Conclusion**

Brady Trucking, Inc.'s Motion to Dismiss (Doc. 13) is GRANTED. The claims against Brady Trucking, Inc. are hereby dismissed without prejudice for lack of personal jurisdiction. Brady's alternative request to transfer the action is denied.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F.Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three

pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 13th day of November 2013, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE